FILED
2012 Jul-23  AM 11:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

DEBRA J. BEATTY,                    )

     PLAINTIFF,                    )

VS.                                 )          2:10-cv-3051-JHH

HUDCO INDUSTRIAL PRODUCTS, )
INC.,
                                    )
     DEFENDANT.

## MEMORANDUM OF DECISION

The court has before it the March 30, 2012 Motion (Doc. # 13) of Defendant Hudco Industrial Products, Inc. ("Hudco") for Summary Judgment.  Pursuant to the court's April 2, 2012 and May 1, 2012 orders (Docs. # 14 & 16), the Motion was deemed submitted, without oral argument, on June 5, 2012.

## I. Procedural History

Plaintiff Debra J. Beatty commenced this action on November 10, 2012 by filing a Complaint in this court alleging that Defendant Hudco violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102, by terminating her based on an actual or perceived disability and failing to reasonably accommodate her (Count I), and violated the  Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§

2601 et seq., by interfering with her rights under the FMLA and retaliating against her for exercising those rights (Count II).  (Doc. # 1 ¶¶ 18-36.)  Defendant's March 30, 2012 Motion (Doc. # 13) for Summary Judgment asserts that: (1) her ADA claims should be dismissed because her impairment did not substantially limit her with respect to major life activities; (2) even if she was disabled under the ADA, she never requested any reasonable accommodation other than a modified work schedule, which she was given; (3) there is no direct or circumstantial evidence of discrimination because of her disability; and (4) the FMLA claim is due to be dismissed because Hudso did not meet the definition of an "employer" under the Act.  (Doc. #13 at 2-3.)

Both parties have filed briefs and submitted evidence in support of their respective positions.  Defendant submitted evidence[1] in support of its own Motion (Doc. #13) for Summary Judgment and filed a supporting brief (Doc. #13) on March 30, 2012.  On May 29, 2012, Plaintiff filed a brief (Doc. #17) and evidence[2] (Doc. #18) in opposition to Defendant's Motion for Summary Judgment.  On June 5, 2012, Defendant filed a brief (Doc. #19) in reply to plaintiff's opposition.

---

[1] The Defendant submitted the following evidence: deposition of Debra Beatty; deposition of Tommy Hudson; Hudco's Responses and Objections to Plaintiff's First Interrogatories and Request for Production; affidavit of Thomas C. Hudson, Jr.; Beatty's Charge of Discrimination; Dismissal and Notice of Rights letter.

[2] The Plaintiff submitted the following evidence: affidavit of Debra J. Beatty; affidavit of Dave Rupnow; August 11, 2010 letter from Stuckey to Beatty.

2

## II. Standard for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. See id. at 323. Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. See id. at 324.

The substantive law will identify which facts are material and which are irrelevant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. See Fitzpatrick, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

4

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  <u>See</u> <u>Fitzpatrick</u>, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  <u>See</u> <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

## III. Relevant Undisputed Facts[3]

Defendant Hudco manufactures a variety of material handling products and equipment used in industries such as coal-fired power plants, mines and pulp and paper mills. (Hudson Dep. at 8.) Thomas C. Hudson, Jr. founded Hudco in 1976 and has served as its President throughout its history. (Id. at 9, 90.)

Plaintiff Beatty started working at Hudco in 2008[4] in the position of bookkeeper. (Beatty Dep. at 83-86; Beatty Aff. ¶ 2.) Hudson was Beatty's direct supervisor. (Bearry Dep. at 90.) When Hudson offered Beatty the position, she told him that she had Multiple Sclerosis (MS), but that it would not affect her ability to do the job. (Id. at 87.) Beatty contends that shortly after she was hired, she received a promotion and was made the Accounting Manager. (Beatty Aff. ¶ 2.) Beatty testified that at the beginning of her employment, "it was just bookkeeping," but later her duties increased and she was responsible for "payables, receivables, did the taxes, kept up with employee files." (Beatty Dep. at 85-86.) "Then when the purchasing agent left or was let go, [she] started doing the . . . purchase orders, and answered the phone, you name it." (Id. at 86.)

---

[3]If the facts are in dispute, they are stated in a manner most favorable to the non-movant. See Fitzpatrick, 2 F.3d at 1115.

[4] There is a dispute as to exactly what month Beatty began her employment with Hudco, but it is not material to the resolution of this case.

### A.  Beatty's Multiple Sclerosis

Beatty was diagnosed with MS in June 2007.  (Beatty Dep. at 43.)  At the onset of her disease, Beatty experienced weakness in her left side, involving her face, arm and leg, and numbness in her left hand, and difficulty with balance.  (Beatty Aff. ¶ 3.)  Beatty testified that her symptoms have been "pretty much" under control while under the care of her doctor, neurologist Emily Riser, since late fall 2007.  (Beatty Dep. at 47, 49.)   Beatty testified that she experienced a relapse in July 2008 (Beatty Aff. ¶ 3), but there is not any evidence in the record regarding this relapse, its duration or whether it affected her ability to do her job.  She also had "a little" relapse in September 2008 and was put on a three-day dose of steroids[5] which cleared her symptoms.  (Beatty Dep. at 57.)

In late December 2008 or early January 2009, Beatty experienced a more serious relapse of her symptoms.  (Id. at 50, 53; Beatty Aff. ¶ 4.)  Beatty testified that her usual symptom were elevated and/or heightened during this relapse:

> [S]ome of the symptoms I had were just amplified.  Like the left side of my face, I haven't felt since '07.  It's been numb and tingly from here (indicating)  to back here

---

[5] Beatty testified that when she had a relapse, she would go to the doctor and receive steroids via an IV to treat her symptoms.  (Beatty Dep. at 49, 57.)  The treatment was in the doctor's office and took approximately 45 minutes.  (Id. at 58.)  With her relapse in September 2008, Beatty would drive herself to the doctor's office in the morning, received treatment, and then go to work at HUDCO.  (Id. at 59, 61.).

7

> (indicating).  But normally it's just no big deal.  I'm used
> to it.  But it became more noticeable.  It became more - my
> mouth dropped on this side (indicating) pretty bad, that
> kind of thing.

(Id. at 54-55.)  Additionally, Beatty experienced "problems speaking" and "cognitive issues" such as difficulty "transposing numbers." (Beatty Dep. at 53.)  She explained that she "could see a word, but what [she] said would be something completely different than what [she] wanted to say." (Id. at 54.)   Beatty occasionally experienced blurry vision during her relapse. (Id. at 65-66.)  She was also fatigued from the relapse and treatment. (Id. at 61-62.)

Because this relapse was more significant, Beatty underwent a five-day steroid treatment. (Id. at 58.)  Like before, the treatment was administered in her doctor's office. (Id.)  Beatty did not miss any work during this relapse, although she did sometimes work less than eight hours in a day. (Id. at 57-58; Beatty Aff. ¶ 4.)  Beatty would drive herself to work, and then go in to her doctor's office after work and receive treatment. (Beatty Dep. at 59, 60.)  If she did have to miss work for treatment, Beatty "made all that up and then some" by skipping lunch or eating at her desk, arriving early or staying later than usual, working on Saturdays or working from home. (Id. at 88-90.)

Throughout all her relapses, Beatty was able to walk, drive, feed herself, cook,

dress herself, write, type and use a calculator. (Id. at 56, 63-64.) She did not have any trouble breathing during her relapses. (Id. at 65.) She occasionally had problems sleeping during treatment because of the steroids, but this was not an ongoing issue. (Id. at 64.) In general, Beatty's MS did not affect her ability to do her job. (Id. at 87-88.) However, during her relapse in January 2009, Beatty "second-guessed" herself a lot and would have Hudco's General Manager Ben Campbell look over her work "to make sure that everything was okay." (Id. at 88, 90.)

Hudson never indicated to Beatty that he thought her MS was causing problems with her work; Hudson never made a negative comment about Hudson's condition or MS in general. (Id. at 122-23, 140-41.) Hudson always allowed Beatty to take time off whenever she requested it - whether to tend to her own personal needs or the needs of her relatives. (Id. at 96-101.) Hudson never complained to Beatty about her missing work for any reason, and Beatty kept up with her own hours. (Id. at 94, 96-97.) Hudson testified that he did not believe Beatty's work was affected by her MS. (Hudson Dep. at 65-66, 73.) Beatty testified, however, that another former employee, Dave Rupnow, told her that before her termination in January 2009, he overheard Hudson and Campbell discussing "the cost of my payroll based on whether it was

worth it or not in my condition."[6]  (Beatty Dep. at 38-40.)

## B. Hudco's Financial Problems

Toward the end of 2008, Hudco's sales orders and resulting revenues began a serious decline.  (Hudson Aff. ¶ 2.)  According to Hudson, "[c]ustomer orders reduced dramatically toward the end of 2008, our revenues were falling, and it was apparent at the time that things would get even worse in the coming months."  (Id.) That prediction materialized and Hudco's revenues in 2009 were almost thirty percent (30%) lower than the average for the previous three years.  (Id.)

Because of its financial woes, Hudco was forced to take many cost-cutting measures.  Hudson did not take a salary in 2008, although he continued to work full-time (around sixty hours per week) as President of the company.  (Id. ¶ 5.) In 2009 and 2010, Hudson accepted reduced salaries of less than half his normal salary.[7]  (Id.) Additionally, Hudson accepted reduced rent[8] for the facilities used by Hudco; although the normal rent was $30,000, in 2008, Hudco paid only $5000 in rent and Hudco  paid no rent in 2009 and 2010.  (Id. ¶ 6.)

---

[6]  Rupnow testified that he heard Hudson state "that he was paying a lot of money to Beatty and wondered if it was justified given her 'condition.'" (Rupnow Aff. ¶ 4.)

[7]  In 2009, Hudson's salary was $42,000 and in 2010 his salary was $50,000.  (Hudson Aff. ¶ 5.)

[8]  Hudson personally owns the facility where Hudco operates.  (Hudson Aff. ¶ 6.)

In addition to sacrifices made by Hudson, Hudco was forced to lay off several employees.  In July 2009, Hudco laid off four employees who were hired before Beatty. (Id. ¶ 4.)  Those employees included: (1) David Rupnow, hired in April 2005, with an annual salary of $70,000, as a Project Manager; (2) Ted Grevas, hired in March 2007, with an annual salary of $70,000, as an Engineer; (3) Anthony Prentice, hired in July 2007, at $16/hour and approximately $32,000 annually, as a Tile Laborer; and (4) Greg Lundy, hired in October 2007, at $12/hour and approximately $24,000 annually, as a Tile Laborer.  (Id.)  Hudson testified that Hudco would have let the employees go sooner, but needed to keep them through the completion of some outstanding projects.  (Id.)

## C.  Beatty's Termination

On January 9, 2009, Beatty had a meeting with Hudson in his office.  (Beatty Dep. at 103.)  According to Beatty, during this meeting it was obvious that she was having trouble talking and she had droopiness in her face.  (Id. at 103-05.)  Beatty discussed her relapse with Hudson and told him that she met with her doctor and that she was on a steroid treatment for her relapse.  (Id. at 103.)  She also informed Hudson that she was going to change medications and that once the steroids were complete, she "should start getting back to [her] old self." (Id.)  According to Beatty, Hudson told her not to worry, that her job was safe, and to take the time she needed

11

to take care of her health.  (Beatty Aff. ¶ 4; Rupnow Aff. ¶ 3.)

A few days later, on approximately January 15, 2009, Ben Campbell informed Beatty of the decision  to eliminate Beatty's position and outsource her bookkeeping duties to an outside accounting firm.  (Hudson Dep. at 68-70, 83, 124, 128; Hudson Aff. ¶ 3.)  Hudson explained that the decision was purely economic:

> With an annual salary of $65,000, Ms. Beatty had been one of Hudco's highest paid employees, and the elimination of her position saved Hudco a substantial amount of money during a very difficult economic period for the company. In 2009, we paid [the accounting firm] around $45,500 for their bookkeeping and accounting services.  In 2008, when Ms. Beatty was bookkeeper, we still paid around $21,000 to the outside accountants.  By eliminating the high-paid internal bookeeper position, the company saved at least $40,000 in 2009.

(Hudson Aff. ¶ 3.)

On the day that she was let go, Beatty testified that she asked Campbell whether she could have  the open receptionist position.  (Beatty Dep. at 125.) Campbell told her that the job was for lower pay, but Beatty told him that was fine, "a job is a job."  (Id.)  She "would be able to keep [her] insurance," plus she knew the company, the filing  system, and thought that she would be good at it.  (Id.)  Campbell told Beatty that he would have to check with Hudson.  (Id. at 126.)  When she asked about it the following day, Campbell told her that they hired someone else for the

receptionist position.  (Id.)

### D.  EEOC Charge and Complaint

Beatty filed her Charge of Discrimination with the EEOC on January 28, 2009,

alleging discrimination on the basis of disability.  (Def.'s Exh. 5.)  On August 13,

2010, the EEOC issued Beatty a Dismissal and Notice of Rights.  (Id.)  Beatty timely

filed her Complaint in this court on November 11, 2010.  (Doc. #1.)

## IV. Applicable Substantive Law and Analysis

Plaintiff's Complaint alleges that Defendant Hudco violated the ADA when it

terminated her employment and when it denied her a reasonable accommodation.

(Doc. #1 ¶¶ 18-27.)  Hudco contends that it is entitled to summary judgment on both

claims.  Additionally, Plaintiff's Complaint contends that Defendant Hudco violated

the FMLA by interfering with her rights under the Act and by retaliating against her

for exercising those rights.  (Id. ¶¶ 28-36.)   In Plaintiff's Opposition, Plaintiff

concedes that "Hudco does not have the requisite number of employees to pursue her

FMLA claim."  (Doc. #17 at 15.)  As such, Defendant Hudco is entitled to summary

judgment on Beatty's claims under the FMLA.  The court discusses Beatty's claims

of disability discrimination below.

### A.  Structure of Analysis

At the outset, the court notes that both parties agree that, since the alleged

discriminatory conduct in this case took place after January 1, 2009, the American

with Disabilities Act Amendments Act of 2008 ("ADAAA") applies.  42 U.S.C. §

12112.  (Doc. # 13 at 10; Doc. # 17 at 4.)  The ADAAA amended the ADA to, among

other things, promulgate a more liberal standard of the term "disabled," making it

significantly easier for a plaintiff to show disability. Indeed, the new regulations state

that:

> The primary purpose of the ADAAA is to make it easier for
> people with disabilities to obtain protection under the
> ADA. Consistent with the Amendments Act's purpose of
> reinstating a broad scope of protection under the ADA, the
> definition of 'disability' in this part shall be construed
> broadly in favor of expansive coverage to the maximum
> extent permitted by the terms of the ADA.

29 C.F.R. § 1630.1(c)(4).

Despite the changes brought about by the ADAAA, courts still utilize the same

McDonnell Douglas burden-shifting analysis used in ADA and Title VII cases.[9]   In

general, a plaintiff may attempt to establish a claim of illegal employment

discrimination through the use of direct evidence, circumstantial (indirect) evidence,

or statistics.  Id.; see Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999).

_____

[9] The court rejects Defendant's contention that it is not an "employer" under the
ADAAA.  The exemption discussed by Defendant was not somehow re-enacted or does not
begin to run again upon the enactment of the ADAAA.  Such an interpretation of the ADAAA
does not make logical sense, and Defendant has not provided the court with any legal support for
its argument.  (Doc. #13 at 11-12; Doc. # 19 at 3.)

A plaintiff's ability to proceed through the use of circumstantial evidence of discrimination is necessarily important because direct proof of discrimination is uncommon.  See Combs v. Plantation Patterns, 106 F.3d 1519, 1537 (11th Cir. 1997); Grigsby v. Reynolds Metals Co., 821 F.2d 590, 595 (11th Cir. 1987).  Here, Plaintiff attempts to prove her case by the use of both direct and circumstantial evidence.

### 1.  Direct Evidence of Discrimination

The Eleventh Circuit defines direct evidence of discrimination as "evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.' " Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1358 (quoting Carter v. Three Springs Residential Treatment, 132 F.3d 635, 641 (11th Cir.1998)).  Direct evidence is evidence that, if believed by the trier of fact, "establishes the existence of discriminatory intent behind the employment decision without any inference or presumption."  E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1283 (11th Cir. 2000) (quoting Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir.1998)); see also Burrell v. Bd. of Trs. of Ga. Military Coll., 125 F.3d 1390, 1393 (11th Cir. 1997); Kilpatrick v. Tyson Foods, Inc., 268 Fed. Appx, 860, 861–62 (11th Cir. 2008).  Moreover, "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of" some impermissible factor

15

constitute direct evidence of discrimination. <u>Rojas v. Florida</u>, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002) (quoting <u>Schoenfeld v. Babbitt</u>, 168 F.3d 1257, 1266 (11th Cir. 1999) (citations and quotations omitted); <u>see</u> <u>Carter v. City of Miami</u>, 870 F.2d 578, 582 (11th Cir. 1989). If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence. <u>Wilson v. B/E Aerospace, Inc.</u>, 376 F.3d 1079, 1086 (11th Cir. 2004) (citing <u>Burrell</u>, 125 F.3d at 1393). Where the plaintiff is able to prove by direct evidence that the employer acted with a discriminatory motive, in order to prevail the employer must prove, by a preponderance of the evidence, that the same decision would have been reached even absent that motive. <u>See</u> <u>Haynes v. W.C. Caye & Co.</u>, 52 F.3d 928, 931 (11th Cir. 1995); <u>Miles v. M.N.C. Corp.</u>, 750 F.2d 867, 875–76 (11th Cir.1985).

## 2. Circumstantial Evidence of Discrimination

"In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." <u>Combs</u>, 106 F.3d at 1527. Under the <u>McDonnell Douglas</u> and <u>Burdine</u> framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a

16

rebuttable presumption that the employer acted illegally.  See id. at 1527-28.  The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation.  See, e.g., Nix v. WLCY Radio/Rahall Commc'ns., 738 F.2d 1181, 1185 (11th Cir. 1984).  In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action, but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.[10]  See McDonnell Douglas, 411 U.S. at 802 (hiring); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); Nix, 738 F.2d at 1185 (discipline); Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

After the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason[11] for its actions.  Rojas, 285 F.3d at

---

[10]  See also McDonnell Douglas, 411 U.S. at 802 n.13 ("The facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations.").

[11]  See Chapman, 229 F.3d at 1032 (A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which the employer based its subjective opinion.).

1342; <u>Combs</u>, 106 F.3d at 1528.  The employer "need not persuade the court that it was actually motivated by the proffered reasons." <u>Burdine</u>, 450 U.S. at 254-55; <u>see</u> <u>Chapman</u>, 229 F.3d at 1024.  If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.  Although the prima facie case is irrelevant after the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case. <u>See</u> <u>Combs</u>, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the <u>McDonnell Douglas</u> and <u>Burdine</u> framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." <u>Burdine</u>, 450 U.S. at. 253. Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgement either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but

18

not compelling the trier of fact to make a finding of illegal discrimination.  See

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48 (2000);[12] St.

Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v. Dubberly, 210 F.3d 1334,

1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d 1303, 1336 (11th Cir.

2000); Combs, 106 F.3d at 1529-38; Hairston v. Gainesville Sun Publ'g Co., 9 F.3d

913, 920-21 (11th Cir. 1993).

### B.  Analysis of Plaintiff's Claims under the ADAAA

In general, an employer may not "discriminate against a qualified individual

with a disability in regard to the job application procedures, the hiring, advancement,

or discharge or employees, employee compensation, job training, and other terms,

conditions, and privileges of employment."  42 U.S.C. § 12112(a).  A "qualified

individual with a disability" is "an individual who, with or without reasonable

accommodation, can perform the essential functions of the employment position that

such individual holds or desires."  42 U.S.C. § 12111(8).  A plaintiff has a disability

if she (1) has a physical or metal impairment that substantially limits one or more of

her major life activities; (2) has a record of such impairment; or (3) is regarded has

having such an impairment. 42 U.S.C. § 12102(1).   An employer unlawfully

---

[12]   The court in Chapman modified the statement in Combs contrary to this holding in
Reeves after noting that the standard for granting summary judgment mirrors the standard for
judgment as a matter of law.  See Chapman, 229 F.3d at 1025, n.11.

discriminates against a qualified individual with a disability when the employer fails to provide "reasonable accommodations" for the disability – unless doing so would impose undue hardship on the operation of the business of the employer.  42 U.S.C. § 12112(b)(5)(A); see also Lucas, 257 F.3d at 1255.  "The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows her to perform the job's essential functions."  Id. at 1255-56; see also Earl v. Mervyn's, Inc., 207 F.3d 1361, 1367 (11th Cir. 2000) and Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286 (11th Cir. 1997).  An employee's failure to request a reasonable accommodation is fatal to the prima facie case; "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made."  Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999); see also Warren v. Volusia County, Florida, 188 Fed. Appx. 859 at *863, No. 05-16411 (11th Cir. July 5, 2006).

### 1.  Direct Evidence of Discrimination in Termination

Plaintiff contends that she has presented direct evidence of discrimination regarding her termination.  She points to the testimony of former employee David Rupnow who testified that shortly before Beatty was terminated, he overheard Hudson say to Campbell that "he was paying a lot of money to Beatty and wondered if it was justified given her 'condition.'" (Rupnow Aff. ¶ 4.)    Beatty similarly

testified that Rupnow told her that he overheard Hudson and Campbell discussing "the cost of [her] payroll based on whether it was worth it or not in [her] condition." (Beatty Dep. at 38-40.)

While the statement was allegedly made by the decisionmaker, and it was made around the time of Beatty's termination, the comment does not amount to direct evidence of discrimination.  Though potentially probative circumstantial evidence of Hudson's state of mind, it does not directly correlate with an intent to discriminate on the basis of disability.  Instead the statement requires an extra step: it requires the factfinder to infer that Beatty's "condition", as opposed to her high salary, motivated his decision to terminate her.  In similar instances the Eleventh Circuit has refused to classify such comments as direct evidence of discrimination.  See Damon, 196 F.3d at 1359 (citing Beaver v. Rayonier Inc., 188 F.3d 1279, 1285-86 (11th Cir. 1999); Burrell, 125 F.3d at 1393-94 (11th Cir.1997) (holding that evidence which suggests, but does not prove, a discriminatory motive, is circumstantial evidence by definition). Simply put, it does not prove discrimination in her termination "without inference or presumption,"  Burrell, 125 F.3d at 1393, and, therefore, is not direct evidence.

Moreover, as pointed out by Defendant (Doc. # 13 at 13-14), there is no admissible, record evidence that Hudson even made this comment.  The only evidence of this comment is the hearsay testimony of Rupnow (and Plaintiff's

repetition of this hearsay comment) regarding what he allegedly overheard and told Plaintiff at some later point.  Hudson denies ever having such a conversation or making such a comment.  (Hudson Dep. at 70-71.)  The court may not consider inadmissible hearsay[13] on a motion for summary judgment.  Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999) (citation omitted).  "Rule 56(e) of the Federal Rules of Civil Procedure requires that affidavits that support or oppose summary judgment motions shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence. This rule also applies to testimony given on deposition." Id. at 1322–23  (citations and quotations omitted).  As such, the court may not consider the statement by Rupnow as admissible evidence at summary judgment.

### 2.  Circumstantial Evidence of Discrimination

As stated above, in evaluating disability discrimination claims based on circumstantial evidence, the Eleventh Circuit requires a plaintiff to first satisfy a three-point prima facie requirement.  In order to establish a prima facie case of discrimination under the ADAAA, the plaintiff must show that: (1) she is disabled; (2) she was a qualified individual at the relevant time; and (3) she was discriminated

---

[13] Inadmissible hearsay is an out-of-court statement, not otherwise excepted under the Federal Rules of Evidence, offered to prove the truth of the matter asserted therein. See Federal Rules of Evidence 801–804.

against because of his disability.  See Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001).  Defendant Hudco contends that Beatty cannot satisfy the first and third elements of her prima facie case, and concedes, for summary judgment purposes only, that she was a qualified individual at the relevant time.  (See Docs. # 13 at 15-20; Doc. # 19 at 3-10.)  The court assumes, without deciding, that Beatty can establish that she was disabled under the new, more lenient guidelines of the ADAAA and moves directly to the heart of the issue – whether Beatty established that she was discriminated against because of her disability.   The court first addresses her termination claim and then addresses her reasonable accommodation claim.

### a.  Termination

Beatty contends that she has presented sufficient evidence that her termination was motivated by her disability.  (Doc. # 17 at 13-14.)  As evidence of discrimination, Beatty points to the following evidence: (1) Hudson and Campbell knew about her disability and that she was experiencing a relapse; and (2) the statement allegedly made by Hudson to Campbell about Beatty's high rate of pay and her "condition." (Id.)   Neither of these reasons establish for the purposes of summary judgment that Hudco discriminated against Beatty because of her disability.  First, the court has already determined that it cannot consider the testimony of Rupnow because it is

23

inadmissible hearsay.[14]   See Section IV.B.1, infra.   Second, mere knowledge of Beatty's disability does not equate with discrimination.  Hudson knew that Beatty had MS from the moment he hired her and there is no evidence before the court that she was ever treated any differently because of her MS.

Additionally, Hudco provided ample evidence of its legitimate, nondiscriminatory reason for Beatty's termination.  Hudco eliminated Beatty's position, as well as taking many other cost-cutting measures, purely for economic reasons.  Hudson testified that the company was experiencing a significant economic downturn at the end of 2008, and decided to eliminate Beatty's position and outsource her duties.  (Hudson Aff. ¶¶ 4-5.)  Hudco saved approximately $40,000 in 2009 by eliminating Beatty's position.  (Id.)  Beatty has not produced any evidence to rebut this legitimate, nondiscriminatory reason for her termination.

### b.  Reasonable Accommodation

Beatty's claim for reasonable accommodation fails for the simple reason that

---

[14] Even if the court were to consider this statement as circumstantial evidence of discrimination, it would not be enough.   The statement, standing alone and in the context of all the other evidence presented, does not satisfy Beatty's burden of establishing that  that intentional discrimination did indeed motivate the defendant.  The statement is likewise insufficient to allow a rational trier of fact to disbelieve the Hudco's proffered legitimate reason, namely that the company was experiencing serious financial difficulties and needed to streamline and cut costs.  See Abel, 210 F.3d at 1339; Alexander, 207 F.3d at 1336; Combs, 106 F.3d at 1529-38.

she did not need an accommodation.  See Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 883 (6th Cir. 1996) (affirming summary judgment on failure to accommodate claim where Plaintiff testified she was physically capable of performing essential functions of job).  Beatty testified throughout her deposition that she could perform all of the essential functions of her job without accommodation:

> Q.  Were you able to perform the essential functions
> of your job —
> A.  Yes.
> Q.  – despite your MS condition?
> A.  Yes.

(Beatty Dep. at 134.)  Even during her worst relapse, Beatty testified that her MS did not affect her ability to do her job, although she stated that she "second-guessed" herself a lot and would have Hudco's General Manager Ben Campbell look over her work "to make sure that everything was okay."  (Id. at 87-90.)

Because there is no evidence that Beatty needed an accommodation to perform her job, there is similarly no evidence that she requested an accommodation.  An employee's failure to request a reasonable accommodation is fatal to the prima facie case; "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made."  Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999); see also Warren v. Volusia County, Florida, 188 Fed. Appx. 859 at *863, No. 05-16411 (11th Cir. July

5, 2006).   Although Beatty seems to suggest that she asked for an accommodation when she inquired about the receptionist position, (Doc. #17 at 2), she was not asking for an accommodation because she could not perform the duties of her current job due to her MS.   Instead, the evidence shows that she inquired about the receptionist position because Hudco eliminated her current position and was terminating her employment.

In summary, there is simply no evidence before the court that Hudco discriminated against Beatty because of her disability.   As such, summary judgment is due to be granted in favor of Hudco on Beatty's claims under the ADA.

## V.  Conclusion

Because no material issues of fact remain, Defendant Hudco Industrial Products, Inc. is entitled to judgment as a matter of law as to all claims asserted by Plaintiff.  A separate order will be entered.

**DONE** this the   23rd   day of July, 2012.

_James H. Hancock_

SENIOR UNITED STATES DISTRICT JUDGE